## SUPREME COURT.

### IN THE MATTER OF THE EMPIRE CITY BANK.

*Stockholders* in every corporation and joint stock association, for banking pur-
poses, issuing bank notes, or any kind of paper credits, to circulate as money,
are *individually responsible, to the amount of their respective shares of
stock, for all its debts and liabilities. (Art. 8, Const. 1846.)*

No suspension of specie payments, by any person, association, or corporation,
issuing bank notes of any description, shall, directly or indirectly, be sanc-
tioned by law. (*Const. supra.*)

On the 5th of April, 1849, the legislature passed an act to give full effect to this
constitutional injunction, and to enforce the responsibility thus declared, and
to provide for the *prompt payment of demands against such corporations
and associations.* This act not only prescribes the manner in which such
responsibility shall be enforced, but expressly declares that it shall be enforced
"*in no other manner.*" And under the act, without first resorting to the
ordinary method of judgment and execution, the creditor, in ten days after
mere refusal of payment, may apply for an order, under which, upon a hearing
of the parties, on short notice, if the judge determine that the corporation or
association "*is not clearly solvent,*" he shall make a further order, declaring
it "*insolvent,*" restraining any further exercise of its corporate or legal rights,
enjoining its assets, and immediately appoint a receiver.

*Held,* that a bank was "not clearly solvent," but most clearly *insolvent,* where
it appeared,

1st. That it had suspended specie payments.

2d. Before such suspension, it was borrowing money frequently, and in large
. amounts, in the aggregate more than $70,000, at the rate, in some instances,
of five per cent. per month.

3d. For refusal to pay its undisputed debts for more than twenty days after
demand.

4th. In suffering judgments against it to be recovered, and executions upon them
to be issued, and to remain, and to be returned unsatisfied, either in whole or
in part.

5th. In allowing an injunction against its business to be issued, and, when that,
on a compromise with the creditors, was withdrawn or dissolved, or supposed
to be, immediately executed (without security) to three individuals—two of
them, if not all, debtors to the institution, and selected by directors occupying
the same position—an absolute assignment of all its property and effects, to the
nominal amount of nearly half a million, to pay its creditors.

The meaning of the term "insolvency," as used in the act of 1849, it is obvious,
is nothing more nor less than inability or unwillingness to pay *promptly,* as

indicated by actual non-payment, persisted in or continued for ten days after demand, or for any time after execution.

An *assignment*, for the benefit of creditors, made by an embarrassed banking institution, is *void* by the statute of 1S49. Unless the original assets of the bank are administered and exhausted, by a receiver appointed under the provisions of that statute, there can be no resort, in case of deficiency, to the supplementary liability of the stockholders.

In the appointment of receiver in these cases, where the assets are counted by hundreds of thousands, private preferences must yield to public considerations. The interests of all parties should rest exclusively, in this respect, on the care and vigilance, and unbiassed judgment of the court.

*New-York General Term, March,* 1855.

MITCHELL, MORRIS, ROOSEVELT, and CLERKE, Justices.

MOTION to set aside assignment, and for appointment of receiver under the statute.

———— ————, *for motion.*

———— ————, *opposed.*

By the court—ROOSEVELT, Justice. By the eighth article of the present constitution of the state—which went into operation on the 1st of January, 1847—it was provided, among other things—and the provision shows the prevailing grievance of the times—that the stockholders in every corporation, and joint stock association, for banking purposes, issuing bank notes, or any kind of paper credits, to circulate as money, should be individually responsible to the amount of their respective shares of stock for all its debts and liabilities; and that no suspension of specie payments, "by any person, association, or corporation, issuing bank notes of any description," should thereafter, directly or indirectly, be sanctioned by law.

On the 5th of April, 1849, to give full effect to the constitutional injunction, and to enforce the responsibility thus declared, and "to provide [as expressed in the title] for the prompt payment of demands against such corporations and associations," the legislature passed an act, under which the present proceeding has been instituted. And to prevent, as it would seem, all possible question or evasion, the act, in a series of thirty-two

In the matter of the Empire City Bank.

elaborately drawn sections, not only prescribed the manner in which such responsibility should be enforced, but expressly declared that it should be enforced "in no other manner."

One of these sections allows a judgment, on any debt exceeding one hundred dollars, against the corporation or association, in twenty days after suit brought, unless the judge, on a sworn statement of facts, shall certify that there is a good defence. Another directs that, upon satisfactory proof, to a judge of the supreme court, that an execution, actually issued, though not returned, cannot be collected, "he shall at once make an order, declaring the insolvency of such corporation or association." And, even without first resorting to the ordinary method of judgment and execution—an operation, however, as has been stated, of only twenty days—the creditor, in ten days after mere "refusal of payment," may apply for an order, under which, upon a hearing of the parties on "short notice," if the judge determine that the corporation or association is "not clearly solvent," he shall make a further order, declaring it "insolvent," restraining any further exercise of its corporate or legal rights, enjoining its assets, and "immediately" appointing a receiver.

Is the Empire City Bank, then, under the evidence before me, "clearly solvent?" The existing officers, chosen only a month or two ago, know but little of its affairs. The president, indeed, from his own declarations, may almost be literally said to know nothing. Both, however, notwithstanding their short and limited acquaintance with the institution, appear, from the lists before me, to have participated in its "accommodations" to the extent of a few thousands. But the *late* cashier, who, it is said, knew the institution well, and had also a share of its favors, although summoned, has not attended, to shed light on the more cloudy, if not more obscure, portions of its history. He has not deemed it necessary, (perhaps not easy,) even to defend himself—and that, against a charge, among other misfeasances appearing on the face of the books, of having permitted one director to loan, or appropriate to himself, more than half the capital, and two or three others a large

portion of the residue. Enough, however, appears, notwithstanding the much-to-be-regretted absence of the late cashier, to enable the court, as it seems to me, very promptly to determine that the bank is "not *clearly* solvent:"

*First.* (And that is a leading indication,)—It has suspended payment.

*Second.* Before the suspension, so unavailable were its assets, and so pressing the demands upon them, that, although authorized itself only to loan at seven per cent. per annum, it was borrowing frequently, and in large amounts, in the aggregate more than $70,000, at the rate, in some instances, of five per cent. per month.

*Third.* Although a banking institution, and bound to the most exact punctuality, it refused to pay its undisputed debts for ten, and even for twenty, days and upwards, after demand.

*Fourth.* It suffered judgment against it to be recovered, and executions upon them to be issued, and to remain, and to be returned unsatisfied either in whole or in part.

*Fifth.* It allowed an injunction against its business to be issued; and when that, on a compromise with the creditor, was withdrawn or dissolved, or supposed to be, immediately executed, (without security,) to three individuals,—two of them, if not all, debtors to the institution, and selected by directors occupying the same position—an absolute assignment of all its property and effects, to the nominal amount of nearly half a million, to pay its creditors. To say that such an institution, of whose history the above is an epitome, whatever may be the numerical proportion between its nominal assets and its real liabilities, is "clearly solvent," and that the judge should officially determine it to be so, involves a proposition utterly at variance with the common use of language, and with the whole spirit of the particular act whose provisions we are called upon to interpret; and especially with that provision which makes an unsatisfied execution, in such cases, conclusive evidence of insolvency, and the only necessary basis for a judicial declaration to that effect. Whatever may be the meaning of the term "insolvency" in other connections, and in other statutes, its

meaning, in the statute before us, can admit of no dispute ; and that meaning, it is obvious, is nothing more nor less than inability, or unwillingness to pay *promptly*, as indicated by actual non-payment, persisted in, or continued, for ten days after demand, or for any time after execution.

This view, it will be observed, disposes of the recital of solvency in the assignment.    It may be that the assets, if nursed by friendly hands, will ultimately, after the usual delays and indulgence, yield enough, as that instrument professes to contemplate, to pay all the creditors in full, besides a surplus for the benefit of the stockholders.    But the very execution of the instrument, under the circumstances, is an admission of present inability, and of the insufficiency of the assets, if allowed to be disposed of in the regular course, to meet the demands upon them ; or else it is an admission, fatal to the legality of the instrument, that it was made " for the use and benefit of the debtor, and to delay and hinder the creditor."

Assignments made for such purposes, even by solvent debtors, are void by the statute of frauds; and still more so, if made by embarrassed banking institutions, are they void by the statute of 1849.    If allowed to stand, when made by such institutions in contemplation of bankruptcy, they would nullify, in effect, the whole scope of the act.    They would, in such case, operate not as a fraud merely on the creditors, but as a fraud on the law, superseding in practice every part of the plan so elaborately devised by the legislature for carrying out its constitutional duties.    For it will be recollected that even the individual responsibility of the stockholders can be enforced " in no other manner " than that prescribed by the act.    So that, unless the original assets of the bank are administered and exhausted by a receiver, appointed under its provisions, there can can be no resort, in case of deficiency, to the supplementary liability of the stockholders.    And it may be,—for charity does not forbid the supposition,—that to escape such liability was one of the inducements to the execution of the assignment. It is a receiver, and a receiver only, that is to convert the assets of the association into cash " with the least possible de-

In the matter of the Empire City Bank.

lay ;" and, within ninety days from his appointment, to declare a dividend. And it is only after such dividend, or rather within thirty days after its being declared, that the judge can refer it to a referee, on notice to all persons concerned, to apportion the claims remaining unsatisfied among the individual stockholders, and to report the proper judgment to be rendered against them. And an " order confirming such report is the only judgment against the individual stockholders that can be rendered ; and the mode prescribed, for entering and executing it, the only "manner" in which the constitutional liability imposed upon such stockholders can be enforced. How, then, can an assignment, defeating all these objects, both legislative and constitutional, retaining in effect, after refusal of payment, the whole control in the hands of the stockholder debtors, and shielding them from the claims of their creditors, be permitted to stand? or, at any rate, to stand in the way of the prescribed action of the court?

My duty, it seems to me, whether disagreeable or otherwise, is perfectly clear—to declare this bank, in the sense of the statute of 1849, insolvent, and to appoint a receiver of its property and effects. The United States' Trust Company, and several highly respectable individuals, have been nominated to discharge the trust. As no mere personal obligation can be equal to the mortgages and public stocks, to the amount of one million of dollars, pledged as security by the trust company, and as that institution has been created by law, among other objects, for the express purpose of meeting such requirements, I can feel no hesitation in making a selection between the nominees. Private preferences, in this as in most other judicial acts, must yield to public considerations. No man, and the counsel of no man, has a right to complain, that he or his particular friend is not appointed a receiver ; especially where the assets, as in these bank cases, to be entrusted to his responsibility, are counted, not by tens, but by hundreds of thousands. There are absent parties interested as well as those who are present—minors, too, as well as adults ; and those who rely, and have a right to rely, exclusively and without professional intervention, on the care and vigilance, and unbiassed judgment of the court.

I make these remarks, not so much with reference to anything that has occurred in these immediate proceedings, as with reference to some incidents in the action of a kindred institution lately before me. In that case, the individual bond of the applicant, fortified by three sureties, in the penalty of $50,000, was tendered in connection with the request of several creditors and stockholders, as an all-sufficient and undeniable basis for the appointment, and no other creditors or stockholders, it was said, objected to the nomination. But no public notice had been given, and, for aught that appeared, a large number of persons, entitled to be heard, or at least to be considered, had no knowledge of the proceeding. This bond was accompanied by the affidavits, not of the principal, but of the three sureties, declaring themselves to be worth, one, fifty thousand, and the others each twenty-five thousand dollars, over and above all debts and liabilities. One of the two last, however, whose name was before me in a list of the assets of another bankrupt institution, appeared to be a defaulter in the shape of overdrafts to the amount of from one to two hundred thousand dollars. And the gentleman subsequently proposed as a substitute in his place, although justifying in the sum of $50,000, "in real and leasehold estate," added by implication that the property was subject to "incumbrances thereon;" and that this, in his opinion, was its value "over and above" them. It was suggested, in answer to these objections, that a clause should be inserted in the order directing the receiver, from time to time, to deposit all sums of $5,000 and upwards in the trust company.

But what additional safeguard is there in such a provision? Does not every order appointing a receiver contain, by implication if not expressly, a direction that all the funds, when collected, shall be kept in some safe depository?

The law, in requiring, as it does, proper "security" from a receiver in these cases, assumes that, although directed, he may not do his duty; and it is only in such a contingency that security is of any importance. And it dispenses with this prerequisite in the case of the appointment of the trust company,

only because " its whole capital stock, property, and effects, are, by law, made absolutely liable for such deposits, in preference " to all other liabilities.

A like order must, therefore, be entered in this case (to be drawn up and submitted for settlement) as in that of the Knickerbocker and Suffolk banks.